UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 0:19-cv-60752-RAR

BRENDA BELL, individually and on behalf
of all others similarly situated,

    Plaintifff,                                        CLASS ACTION

v.

ROYAL SEAS CRUISES, INC., a Florida
corporation,

    Defendant.
_____/

**PLAINTIFF'S OPPOSING MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

Pursuant to Local Rule 7.1(c), Plaintiff Brenda Bell ("Plaintiff" or "Bell") hereby files this Opposing Memorandum of Law in response to Defendant Royal Seas Cruises, Inc.'s ("Defendant" or "Royal Seas") Motion to Compel Arbitration and Dismiss the Complaint (dkt. 16). As the basis for her opposition, Plaintiff states as follows:

**I.    INTRODUCTION**

Defendant's Motion is premised on the view that Plaintiff agreed to arbitrate any claims against Royal Seas, including the TCPA claims at issue in her Complaint. However, Bell never entered into any such agreement, and therefore she cannot be compelled to arbitrate her claims. The supposed agreement proffered by Royal Seas cannot be enforced for three reasons: (1) Plaintiff denies visiting the website identified by Royal Seas, and Defendant's supporting

1

affidavit by Mitenkumar Bhadania does not contain sufficient evidence to refute her denial or to prove that she visited the lead generation website; (2) even if Plaintiff had visited the website, Defendant has shown that the terms and conditions were presented to consumers as "hybridwrap" that is not sufficient to obtain assent; and (3) Royal Seas has no right to enforce the arbitration clause as a third-party beneficiary because the terms and conditions do not expressly extend to Defendant or the website in question. Accordingly, Royal Seas has no basis to compel Plaintiff to arbitrate her claims, and likewise Royal Seas has provided no credible basis for dismissal of the Complaint. The Court should deny Defendant's Motion and permit the case to proceed to discovery.

**II.   BACKGROUND**

On November 6, 2018, Plaintiff received an unsolicited call from Royal Seas on her cellphone, which included a prerecorded voice message. (Compl., ECF 1, at ¶ 19.) During the call, Plaintiff asked the Defendant to stop calling her. (*Id.*) Nevertheless, Plaintiff continued to receive calls from Royal Seas, originating from a variety of phone numbers. (*Id.* ¶ 20.) Plaintiff had previously registered her phone number on the National Do Not Call Registry, and she did not consent to the calls from Royal Seas. (*Id.* ¶¶ 18, 22.) In order to redress her injuries and stop the calls, Plaintiff filed the Complaint on March 22, 2019, on behalf of herself and Classes of similarly situated individuals. (*Id.* ¶ 26.)

On May 9, 2019, Royal Seas filed its Answer in response, including twenty (20) affirmative defenses. (ECF 13.) More than a month later, Defendant uncovered an arbitration agreement to which Plaintiff was supposedly a party, and Royal Seas informed Plaintiff of its intent to seek arbitration. (*See* Ex. B to Def.'s Mot. for Leave to File Am. Answer, ECF 15-1.) Shortly thereafter, on June 25, 2019, Royal Seas filed the present Motion, supported by the

Affidavit of Mitenkumar Bhadania ("Bhadania Affidavit"). (*See* ECF 16, 16-1.) The Bhadania Affidavit details that a "visitor to a Fluent website," specifically www.consumerproductsusa.com ("Website"), submitted an entry on September 11, 2018, for an online sweepstakes, using Plaintiff's name and phone number, as well as other personal information related to Plaintiff. (ECF 16–1, at ¶¶ 6, 11–12.) The visitor supposedly clicked through the website, including a page that linked to terms and conditions containing an arbitration agreement. (*Id.* ¶¶ 7–9.)

The terms and conditions linked on the Website refer to users of RewardZoneUSA.com, NationalConsumerCenter.com, and "other websites" operated by RewardZone USA, LLC ("RewardZone"). (ECF 16-2, at 2.) Additionally, the arbitration provision purports to extend to "any disputes or claims" with RewardZone and its affiliates, as well as its advertiser clients and "marketing partners." (*Id.*) The marketing partners are not listed in the arbitration clause, or anywhere in the terms and conditions. Rather, as the Bhadania Affidavit points out, a subsequent page on the Website contained a link to a list of marketing partners of "CAC," an entity that has not been identified. (ECF 16-1, at ¶ 12–13.) The Affidavit contains a partial reproduction of this list, which includes Royal Sea Cruises, Inc. (*Id.* ¶ 13.) Accordingly, Royal Seas seeks to enforce the mandatory arbitration clause as a "marketing partner" under the RewardZone terms and conditions. (ECF 16, at 2.)

In response, Plaintiff testifies that she never visited the Website or authorized anyone to do so on her behalf. (Declaration of Brenda Bell, attached hereto as Exhibit A, at ¶ 6.) Even though her personal information appears correctly in the Bhadania Affidavit, Bell did not provide that information to Defendant or the Website. (*Id.* ¶ 8.) Indeed, Plaintiff has never provided her personal information as part of an online sweepstakes submission, let alone on September 11, 2018 or at the www.consumerproductsusa.com website. (*Id.* ¶ 9–10.)

3

### III. ARGUMENT

#### A. Plaintiff Unequivocally Denies Visiting The Lead Generation Website Identified By Royal Seas, And The Bhadania Affidavit Is Insufficient To Prove That She Did.

In its Motion, Royal Seas asks the Court to compel Plaintiff to arbitrate her claims against Defendant, based on a supposed agreement to arbitrate that is now before Court through the Bhadania Affidavit. However, the facts and evidence put forth in the Bhadania Affidavit are insufficient to prove that Bell agreed to arbitration or any other terms. In short, Plaintiff did not visit the website which supposedly contained this agreement, and she therefore did not enter into the agreement that Royal Seas now seeks to enforce.

The first task of a court asked to compel arbitration is to determine whether the parties agreed to arbitrate.[1] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). As a preliminary matter, and as Royal Seas recognizes in its Motion, "parties cannot be forced to submit to arbitration if they have not agreed to do so." *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782, 785 (11th Cir. 2008) (quoting *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992)); (Def.'s Mot. to Compel, ECF 16, at 4). A party that wishes to avoid arbitration must unequivocally deny that an agreement was made, with evidence to substantiate the denial. *Magnolia*, 272 Fed. Appx. at 785.

When considering whether the parties agreed to arbitrate, courts apply a summary-judgment like standard, as an order compelling arbitration is effectively a "summary disposition of the issue of where or not there ha[s] been a meeting of the minds on the agreement to

---

[1] Defendant claims that even the validity of the arbitration agreement must be arbitrated. (ECF 16, at 5–6.) However, Plaintiff's challenge to the "validity" of the agreement is not based on construction of its terms—rather, Plaintiff denies that any agreement was made to begin with, in which case arbitration cannot be compelled on any issue.

arbitrate." *Id.* (alterations in original); *see also In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014); *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013) (holding that a motion to compel arbitration should be judged under the Rule 56 standard when the movant has facially established arbitrability but the non-movant has raised its own evidence to place the question at issue). A district court considering the making of an agreement to arbitrate "should give to the [party denying the agreement] the benefit of all reasonable doubts and inferences that may arise." *Magnolia*, 272 Fed. Appx. at 786 (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). In other words, when opposing parties "tell two different stories," the Court must "accept the non-movant's version of events unless it 'is blatantly contracted by the record.'" *Richardson v. Verde Energy USA, Inc.*, 354 F. Supp. 639, 652–53 (E.D. Pa. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Here, both Plaintiff and Defendant have supported their positions with testimonial evidence. Royal Seas has provided the Bhadania Affidavit, which states that Bell's personal information was submitted to the sweepstakes Website by a visitor on September 11, 2018. (ECF 16-1, at ¶¶ 6–7, 11–12.) Conversely, Plaintiff provides her own declaration, testifying that she never visited the Website and did not provide her personal information to any online sweepstakes. (Ex. A, at ¶¶ 6–10.) The declaratory evidence before the Court tells two different stories as to whether Plaintiff agreed to arbitrate her claims, but the underlying accounts are not contradictory—the fact that Royal Seas obtained Bell's information from this particular lead generation website does not guarantee that Bell visited the website and entered the information herself. And if Bell did not visit the website and submit her information, then she did not agree to arbitrate any claims against Royal Seas.

5

Defendant will likely seek to discredit Bell's denial as insufficiently supported, but other courts have found such denials sufficient to counter affidavits that were not only similar to Defendants but *submitted on behalf of the same Fluent, LLC employee*. For example, the Northern District of California in *Berman* found that the plaintiff's sworn denial that he did not visit the subject lead generation website was enough to create a factual dispute as to whether Berman consented to the terms and conditions containing an arbitration clause. *Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060-DMR, 2018 WL 2865561, at *4 (N.D. Cal. June 11, 2018). Berman's denial was strengthened by the fact that the declaration by Bhadania in that case contained personal information that was unrecognizable to him. *Id.* at *3–4. In any event, the court denied the defendant's motion to compel arbitration, "[i]n light of Berman's numerous and unequivocal denials, *and resolving all reasonable doubts in Berman's favor*." *Id.* at *4 (emphasis added).

In another instance, a plaintiff in the Eastern District of Pennsylvania made a similar denial that he had visited a website, even though his personal information did match what the defendant provided. *Richardson v. Verde Energy USA, Inc.*, 354 F. Supp. 3d 639, 652–53 (E.D. Pa. 2018). Considering a motion for summary judgment on the issue of consent to be called, the court found that the statements in Bhadania's declaration were consistent with both the defendant's theory that Richardson submitted the consent form and Richardson's theory that "a different person (or algorithm or 'bot') in possession of his contact information filled out the online registration." *Id.* at 652 (internal quotations omitted). The tipping point, of course, was that the court "must accept the non-movant's version of events," which were not blatantly contracted by the Bhadania declaration submitted in that action. *Id.* at 652–53.

While Plaintiff does not yet have enough information to theorize exactly how Royal Seas and the Website obtained her information, her testimony can be reconciled with the Bhadania affidavit in a way that highlights the insufficiency of Defendant's evidence to establish an agreement to arbitrate. In a similar case currently pending against Royal Seas, the Southern District of California noted that "online 'opt-in' forms present a unique risk in which data may pertain to a particular consumer, but ultimately may have been actually obtained through sources other than the consumer." *McCurley v. Royal Seas Cruises, Inc.*, No. 17-cv-00986-BAS-AGS, 2019 WL 1383804, at *26 (S.D. Cal. Mar. 27, 2019). When considering whether the plaintiff consented to calls, the court refused to credit Royal's "bare assertions" about who completed its lead generation form in the absence of evidence from an actual class member who completed the form and would attest to providing consent. *Id.* Thus, the court found no actual evidence of prior consent: the declarations filed by Royal Seas demonstrated no personal knowledge of whether class members "actually visited and completed the forms," and Royal Seas did not produce any evidence to link the plaintiffs to the IP address associated with the consent records. *Id.* at 25–26.

Here, the same issues appear in Defendant's testimonial evidence. The Bhadania Affidavit refers generally to "a visitor" to the Website who submitted Bell's information. (*See* ECF 16-1, at ¶ 5.) The visitor "provided his/her identifying information" to the site, and Bhadania included "regenerated HTML" that displays Plaintiff's information. (*Id.* ¶¶ 7, 12.) Though this testimony may be true, it does not demonstrate any personal knowledge that Bell herself visited the Website. Further, the affidavit includes the IP address associated with the user who submitted the information, but neither Bhadania nor Defendant have produced any evidence

that Plaintiff is associated with this IP address.[2] Defendant's testimonial evidence may be true, but it is not enough to demonstrate that Plaintiff visited the Website, especially in light of her declaration. (*See* Ex. A.)

In short, Royal Seas has not provided sufficient evidence to prove that Plaintiff entered into an agreement to arbitrate her claims against Defendant. Bell denies visiting the lead generation website, and her denial does not contradict the evidence before the Court. As the nonmoving party, Plaintiff is entitled to a construction of the facts in her favor, and Defendant's Motion to Compel should therefore be denied.

> **B.  The Supposed Arbitration Agreement Is Presented In Hybridwrap Terms And Conditions, And Use Of The Website Was Not Properly Conditioned On Assent To Those Terms.**

Even if Plaintiff had visited the Website, an enforceable agreement to arbitrate still would not exist because use of the site is not conditioned on assent to the terms and conditions. The Website's terms, as put forth in the Bhadania Affidavit, are presented to consumers in a hybridwrap format that does not properly obtain assent to mandatory arbitration or any other contract term. Accordingly, simply using the lead generation site would not be enough to create an enforceable agreement to arbitrate, for Bell or any other member of the Classes.

For any contract to be binding and enforceable, the proponent must show "mutual assent to certain and definite contractual terms; without a meeting of the minds on all the essential terms, no enforceable contract arises." *IT Strategies Group, Inc. v. Allday Consulting Group, LLC*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013) (quoting *Matter of T & B General Contracting, Inc.*, 833 F.2d 1455, 1459 (11th Cir. 1987)). Contracts formed over the internet

---

[2] Preliminary research conducted by Plaintiff's counsel suggests that the IP address provided is associated with Detroit, Michigan or Akron, Ohio. Bell has never been to either city, let alone on September 11, 2018. (Ex. A, at ¶ 11.)

have not changed these fundamental principles and thus are subject to the same formation analysis. *See IT Strategies*, 975 F. Supp. 2d at 1280. Unsurprisingly, the key issues in internet contract formation are most often notice and manifestation of assent. *MetroPCS Commc'ns, Inc. v. Porter*, No. 3D17-375, 2018 WL 6786813, at *3 (Fla. Dist. Ct. App. Dec. 26, 2018).

In the case of internet sales, agreements generally take one of two forms: the first is a clickwrap agreement, which occurs when a website directs purchasers to its terms and conditions and requires the user to click a box and acknowledge that they read the terms. *MetroPCS*, 2018 WL 6786813, at *3. The second type, a browsewrap agreement, occurs when a website "merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process." *Id.* While clickwrap agreements are routinely enforced, browsewrap agreements are only enforced when the purchaser has actual knowledge of the terms or when the hyperlink is conspicuous enough to put the purchaser on inquiry notice. *Id.*

Of course, not all internet agreements pertain to purchases, and not all agreements fit neatly into one of these two categories. Thus, some courts have recognized "hybridwrap" agreements—an intermediary type of agreement that may involve an affirmative click to acknowledge hyperlinked terms. *See Anand v. Heath*, No. 19-CV-00016, 2019 WL 2716213, at *4 (N.D. Ill. June 28, 2019); *see also Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1303 (M.D. Fla. 2018). The same issues of notice and assent are determinative when considering enforcement of hybridwrap agreements:

> Courts typically "will give effect to hybridwrap terms where the button required to perform the action manifesting assent … is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms." "The more the hybridwrap design diverges from this basic layout—such as by placing the notice further away from the action button, cluttering the screen with potentially distracting content, or *omitting the language*

9

> *explicitly saying that by performing action the user agrees to be bound by the terms*—the less likely courts are to find that inquiry notice has been provided."

*Anand*, 2019 WL 2716213, at *4 (emphasis added) (citations omitted).

In *Anand*, the court ultimately found the agreement unenforceable because "nothing expressly linked the website's 'I understand and agree…' language to the 'Continue' button." *Id.* Even though the plaintiff clicked the button to continue, the website did not include any notice or explanation that doing so constituted assent or that continuing on the site was conditioned on assent. *Id.* "[T]he mere proximity of a terms and conditions hyperlink to a button that the user must click to proceed *does not equate to an affirmative manifestation of assent* to the terms and conditions." *Id.* (emphasis added).

Defendant is eager to classify the Website's terms (and the arbitration clause) as a clickwrap agreement (ECF 16, at 6–7), but in reality the terms are presented in hybridwrap form. According to reproductions in the Bhadania Affidavit, the Website that hosted the supposed agreement presented its visitors with a hyperlink to terms and conditions above a "Continue" button. (ECF 16-1, at ¶¶ 8–9.) This site layout is not just similar, but nearly *identical* to that which was deemed hybridwrap in *Anand*: though the website in question was www.retailproductzone.com, defendants RewardZone and Fluent submitted another Bhadania affidavit that contained a similar screenshot of the site's hyperlink and "Continue" button. *Anand*, 2019 WL 2716213, at *1. The words above the "Continue" button in *Anand* read "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." *Id.* Here, the words on Royal Seas' lead generation website match this phrase almost exactly, save for inclusion of the words "email marketing." (ECF 16-1, at ¶ 8.) In both cases, the site lacks language notifying website visitors that clicking "Continue" constitutes assent. As a result, and without mutual assent, neither hybridwrap agreement is enforceable.

Though Plaintiff denies visiting the Website identified by Royal Seas, the website does not sufficiently obtain user assent to its terms and conditions. Neither Bell nor any other potential visitor to www.consumerproductsusa.com could be bound by an agreement to arbitrate because the site's hybridwrap construction omits language required to notify readers that their click would constitute acceptance. Even if Bell had visited the Website, Royal Seas could not compel her to arbitrate her claims. Defendant's Motion to Compel should likewise be denied.

### C. Defendant Cannot Enforce Arbitration As A Third Party Beneficiary Because The Agreement Does Not Expressly Extend To Royal Seas Or The Lead Generation Website In Question.

While Plaintiff detailed above that she did not agree to arbitrate her claims (and that the Website would not have properly obtained assent even if she *had* visited it), Royal Seas cannot compel arbitration for yet another reason: Defendant has failed to demonstrate that it is an intended third party beneficiary to the Website's terms and conditions. The arbitration clause purports to cover all claims against a vague and incalculably broad mass of unnamed "marketing partners"—who are not identified in the terms and conditions—associated with a similarly vague collection of "other websites." (ECF 16-2, at 2.) In other words, neither Royal Seas nor the Website are expressly identified as third party beneficiaries, and they therefore cannot enforce the arbitration clause. The contract's incomprehensibility should be interpreted against its drafters, and Defendant's Motion to Compel should likewise be denied.

As a reminder, Royal Seas is attempting to compel arbitration as a result of a supposed agreement between Plaintiff and RewardZone—at most, Defendant could only enforce the terms and conditions as a third-party beneficiary. Under Florida law, a party may qualify as a third-party beneficiary if the agreement is executed for the "primary and direct benefit" of that party. *Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*, No. 8:13–cv–1408–T–TBMA, 2014 WL

11

12650701, at *2 (M.D. Fla. Oct. 3, 2014). The party claiming to be a third-party beneficiary bears the burden of proving that the parties to the contract intended to confer such a benefit. *THI of New Mexico at Vida Encantada, LLC v. Archuleta*, No. Civ. 11–399 LH/ACT, 2013 WL 2387752, at *12 (D.N.M. Apr. 30, 2013).

In the context of arbitration, the dispositive finding must be "express and unequivocal agreement" that the parties would arbitrate their claims involving the third party. *See In re Prudential Ins. Co. of Am. Sales Practice Litig. All Agency Action*, 133 F.3d 225, 229 (3d Cir. 1998). For example, courts have found express intent to confer the benefit of agreements to arbitrate to third parties based on the following language: extension to "related or affiliated companies, entities, or individuals,"[3] to "agents, employees or representatives,"[4] and of course to entities that are explicitly referred to and named in the agreement.[5] Nevertheless, any ambiguities in the contract must be construed against the drafter. *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1247–48 (11th Cir. 2002).

In its Motion, Defendant contends that it is entitled to enforce the arbitration agreement as a "marketing partner." (ECF 16, at 8–9.) However, this term is too broad and ambiguous to qualify as express intent to allow Royal Seas to enforce this contract against any consumers who may have entered into it. The arbitration clause contained in the RewardZone terms and conditions states as follows:

> These Terms contain a mandatory arbitration provision below that requires you to arbitrate individually any disputes or claims you may have with us and our affiliates, advertiser clients and marketing partners (collectively, "Marketing Partners") who are third party beneficiaries of the mandatory arbitration provision.

---

[3] *Berrios v. Hovic*, No. CIV. 05–CV–192, 2010 WL 2384589, at *7–8 (D.V.I. June 9, 2010).
[4] *THI of New Mexico*, 2013 WL 2387752, at *12.
[5] *Stone v. Pennsylvania Merchant Group, Ltd.*, 949 F. Supp. 316, 321 (E.D. Pa. 1996).

(ECF 16-2, at 2.) While the term "affiliate" bears financial and legal significance, such that the court in *Berrios* could readily identify beneficiaries, the term "marketing partner" is ambiguous. *See Berrios*, 2010 WL 2384589, at *7–8. RewardZone's terms and conditions do not list or define "marketing partners"; further, while the terms contain a number of hyperlinks to view other documents and webpages,[6] there is no such link to a list of marketing partners that a consumer could view before supposedly agreeing to arbitrate its claims. Through the Bhadania Affidavit, Defendant confirmed that consumers are *not* able to view any list of marketing partners until *after* they supposedly agree to mandatory arbitration. (ECF 16-1, at ¶¶ 7–8, 12.) Even then, it is unclear as to whose marketing partners are being listed: the webpage's text refers to "CAC and our [sic] Marketing Partners," but there is no indication as to who or what CAC means. (*Id.* ¶ 12.) Bhadania is employed by Fluent, LLC, the website at issue is ConsumerProductsUSA.com, and the terms in question refer only to RewardZone and NationalConsumerCenter.com—nothing that could be reasonably identified as CAC. (*Id.* ¶¶ 1,6); (ECF 16-2, at 2.)

Of even greater concern is the vast quantity of unnamed "marketing partners" that this ambiguous term attempts to shield from litigation. Bhadania provided a partial list of the marketing partners named at the hyperlinked page: under only a few letters of the alphabet, thirty-five (35) distinct entities are displayed. (ECF 16-1, at ¶ 13.) This snapshot suggests that the Website lists *hundreds* of marketing partners at any given time. Though this quantity seems large, it becomes even larger when reviewing the RewardZone terms and conditions, which apply to "RewardZoneUsa.com, NationalConsumerCenter.com *and other websites*." (ECF 16-2,

---

[6] The terms appear to hyperlink at least five unique items: (1) the written notice required to opt out of mandatory arbitration (ECF 16-2, at 2, 7); (2) a Representative Offer Chart (*id.* at 3); an Incentive Status webpage (*id.*); and a link to contact RewardZone (*id.* at 4–6); and (5) the Privacy Policy (*id.* at 6).

at 2) (emphasis added). Not only is the Website in question unnamed in the terms and conditions—it is apparently just one of an unknown quantity of "other websites" operated by RewardZone. (*Id.*) If each website contains its own list of marketing partners, the number of entities that are supposedly insulated from litigation of "any disputes and claims" could be exponentially greater. (*See id.*)

Even if Plaintiff had visited the site and agreed to arbitrate her claims against RewardZone (she did not), Defendant has not met its burden to prove that the agreement expressly intended to expand the arbitration clause to cover claims against Royal Seas. According to Defendant, the mandatory arbitration clause at issue binds consumers who visit one of an unknown number of websites to arbitrate *any claims* they may have against *hundreds* of telemarketing entities that are not even identified until *after* the consumer is asked to agree to arbitration. Royal Seas should not be permitted use the ambiguous "marketing partners" label to shield itself and escape from defending Plaintiff's claims in a court of law. The ambiguity created by this broad, umbrella term must be construed in favor of Bell and against RewardZone and its "marketing partners," including Royal Seas. Thus, Defendant's Motion to Compel should be denied.

## IV. CONCLUSION

Defendant's Motion to Compel Arbitration and Dismiss this action should be denied. Royal Seas has proffered an arbitration agreement that it cannot enforce against Bell because: (1) she did not visit the website that supposedly bound her to the agreement; (2) the website was designed in a way that did not properly bind any of its visitors to the terms in question; and (3) the arbitration clause's ambiguous "marketing partners" language is insufficient to expressly confer the benefit of enforcement on Royal Seas as a third party.

WHEREFORE, Plaintiff Brenda Bell respectfully requests that the Court enter an order denying Defendant's Motion to Compel Arbitration and Dismiss the Complaint and granting any other relief the Court deems necessary and just.

DATED: July 23, 2019

Respectfully submitted,

/s/     Ryan S. Shipp
Ryan S. Shipp
Florida Bar ID 52883
ryan@shipplawoffice.com
Law Office of Ryan S. Shipp, PLLC
814 Lantana Road, Suite 1
Lake Worth, Florida 33462
Tel: (561) 699-0399

*Attorney for Plaintiff*