**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CV-60752-RUIZ/STRAUSS**

**BRENDA BELL,**

    Plaintiff,

v.

**ROYAL SEAS CRUISES, INC.,**

    Defendant.

_____/

**REPORT AND RECOMMENDATION**

    THIS MATTER came before the Court upon Defendant's Motion to Compel Arbitration and to Dismiss Plaintiff's Class Action Complaint [DE 16] ("Motion"). The Motion was referred to the undersigned, pursuant to the Order Referring Motions to Magistrate Judge [DE 34], to take all necessary and proper action as required by law. The undersigned has reviewed the Motion and the Response [DE 26] and Reply [DE 29] thereto. For the reasons discussed herein, the undersigned **RECOMMENDS** that the Motion [DE 16] be **DENIED WITHOUT PREJUDICE** pending a bench trial on the limited issue discussed in Part III of the Analysis section below. If the Court finds for Defendant on that limited issue, the undersigned recommends that the Motion then be **GRANTED**.

**BACKGROUND**

    Plaintiff filed a Class Action Complaint [DE 1] alleging violations of the Telephone Consumer Protection Act (TCPA) after receiving approximately five (5) telemarketing calls from Defendant. Defendant seeks to compel arbitration, asserting Plaintiff agreed to an arbitration provision governing the dispute that is the subject of the Complaint, when Plaintiff visited a website (http://www.consumerproductsusa.com; the "Website") on September 11, 2018. The

Website is owned and operated by RewardsZone USA, LLC.  According to an affidavit Defendant filed in support of its Motion ("Bhadania Affidavit"), visitors to the Website are prompted to provide identifying information, including their name, telephone number, email address, mailing address, and birth date.  DE 16-1 at ¶¶ 7, 11-12.  Although not described in the Motion or the accompanying affidavit, based on the Website's terms and conditions (and descriptions in Plaintiff's response), this gathering of information is under the auspices of the Website user registering for an online sweepstakes or promotion.  DE 16-2 at p.2.

Per the Bhadania Affidavit, a user visited the Website on September 11, 2018, and provided Plaintiff's name and other identifying information.  DE 16-1 at ¶¶ 7, 11-12.  The user then clicked on the below-pictured "Continue" button (around 11:09 a.m. EST), which was directly underneath the following statement:



DE 16-1 at ¶¶ 7-8.  The Terms and Conditions (which can be viewed by clicking the hyperlinked "Terms & Conditions" above) contain an arbitration provision.  This provision requires the person visiting the Website "to arbitrate individually any disputes or claims you may have with [the Website owner] and [its] affiliates, advertiser clients and marketing partners (collectively, "Marketing Partners") who are third party beneficiaries of the mandatory arbitration provision."  *Id.* at ¶ 9.  The terms then specify, by way of example, that disputes regarding telemarketing or the

receipt of SMS/text messages will be subject to arbitration. *Id.* Moreover, absent resolution of a dispute "concerning any aspect of the[] Terms & Conditions" directly with the owner of the Website, the arbitration provision requires the submission of the dispute to arbitration before the American Arbitration Association. DE 16-2 at p. 6. It also delegates "exclusive authority [to the arbitrator] to resolve any dispute including any claim that all or any part of the Terms & Conditions, including this provision, are unenforceable." *Id.* at pp. 6-7.

The Terms and Conditions do not identify who the Marketing Partners are. On a subsequent page, apparently displayed after a user clicks the Continue button described above, the user is asked to confirm his or her personal information to complete registration. DE 16-1 at ¶ 12. Below a display of the information the user provided appears a message explaining that the user, by checking a box and clicking another Continue button, consents to receive telephone sales calls and text messages "from CAC and our Marketing Partners" on the telephone number the user provided. *Id.* The words "Marketing Partners" are hyperlinked, and clicking on that link displays an extensive list of "call center brand names" including Defendant. *Id.* at ¶ 13.

According to Plaintiff's declaration, however, Plaintiff never visited the Website prior to the filing of the Motion (on June 25, 2019), and she never authorized anyone to visit the Website on her behalf. *See* DE 26-1 at ¶ 6. Indeed, she asserts that she has never provided her information to, or participated in, any online sweepstakes, nor authorized anyone else to do so on her behalf. *Id.* at ¶¶ 9-10, 12. Nevertheless, Plaintiff acknowledges that the person who visited the Website on September 11, 2018 provided Plaintiff's correct name, phone number, mailing address, email address, and date of birth. *See id.* at ¶ 8. The Website also recorded an IP address associated with the user who provided Plaintiff's information. Neither party has presented evidence identifying the subscriber to whom the IP address was assigned; though, Plaintiff asserts (in an unsworn

3

statement) that "preliminary research" by her counsel indicates the IP address is associated with Detroit, Michigan or Akron, Ohio. DE 26 at n.2. Plaintiff's declaration states that Plaintiff has never visited either city. DE 26-1 at ¶ 11.

## **LEGAL STANDARD**

An arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Federal Arbitration Act ("FAA") "creates a 'presumption of arbitrability' such that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115-16 (11th Cir. 2014)). Notably, "parties may agree to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). If the parties clearly and unmistakably agreed to arbitrate gateway issues, then the arbitrator decides those issues; otherwise, the court decides any gateway issues. *See id.* at 1267.

Nevertheless, when the making of the arbitration agreement is at issue, courts must find that the parties agreed to the arbitration agreement before referring the matter to arbitration. *See Rent-A-Ctr.*, 561 U.S. at 68 ("The court 'shall' order arbitration 'upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue.'" (quoting 9 U.S.C. § 4)). Significantly, the presumption of arbitrability "does not apply to disputes concerning whether an agreement to arbitrate has been made." *Bazemore*, 827 F.3d at 1329 (quoting *Dasher*, 745 F.3d at 1116).

"If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. To determine whether the making of the arbitration agreement is in issue, courts apply a summary judgment-like standard. *Bazemore*, 827 F.3d at 1333. Thus, "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Id.* (citing Fed. R. Civ. P. 56(a)). "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."[1] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted). The Eleventh Circuit "repeatedly has emphasized that '*state law* generally governs whether an enforceable contract or agreement to arbitrate exists.'" *Bazemore*, 827 F.3d at 1329 (citation omitted).

Ultimately, if a genuine dispute of material fact regarding the making of an arbitration agreement exists, courts must move forward with the trial provided for in 9 U.S.C. § 4. *See Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017). Although one has a statutory right (but not a constitutional right), pursuant to § 4, to specifically demand a jury trial on the issue of the making of an arbitration agreement (in the context of a motion to compel arbitration), that statutory

---

[1] Neither party addresses which state's laws should apply to the contract formation issues; nor do they suggest that there is a conflict between any of the state laws that may apply. Although the parties do not expressly argue that any specific state's laws should apply, both parties cite to Florida case law and appear to apply Florida law to at least certain issues. Therefore, the undersigned also applies Florida law to the contract formation issues. The undersigned finds that it is proper to apply the law of the forum state (Florida) because the parties have not identified any conflict of law. *See Nationmotor Club Inc. v. Stonebridge Cas. Ins. Co.*, No. 10-CV-81157, 2013 WL 6729664, at *11 (S.D. Fla. Oct. 29, 2013) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state." (quoting *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir. 1993))). While the agreement at issue contains a choice of law provision, the Court cannot apply that provision here when it is deciding whether the parties actually entered into that agreement in the first place.

5

right is waived if a jury demand is not made in accordance with § 4. *See Burch*, 861 F.3d at 1347-50. Importantly, a general jury demand in a complaint is insufficient to preserve the statutory right to a jury trial under § 4. *Id.* at 1349-50.

## **ANALYSIS**

Plaintiff opposes the Motion for three (3) reasons. First, Plaintiff contends that no agreement to arbitrate was ever made because she did not visit the Website on the date in question or any other date prior to the filing of the Motion. In other words, Plaintiff argues that, since she never visited the Website, she could not have clicked the Continue button to indicate assent to the arbitration agreement (assuming that would constitute consent).[2] Second, Plaintiff argues that, even if she was the person who visited the Website and clicked the Continue button, such conduct is insufficient to create an agreement. That is because, according to Plaintiff, the Website is designed in a manner that is insufficient to capture assent to the Terms and Conditions (including the arbitration provision) from the person clicking the Continue button (unless that person has actual knowledge of the Terms and Conditions). Third, Plaintiff argues that even if an agreement to arbitrate was made, Defendant is not a third-party beneficiary that is entitled to enforce the arbitration agreement.

Defendant replies arguing that the issues Plaintiff raises must be decided by the arbitrator because the arbitration agreement contains a delegation clause pursuant to which the arbitrator, not the Court, is tasked with deciding gateway issues. However, Defendant argues that if the Court is to decide the merits of Plaintiff's three (3) arguments, it should rule in Defendant's favor because Plaintiff's declaration is insufficient to create a genuine issue of material fact, the Website provided

---

[2] A similar argument would apply to whether Plaintiff consented to receive the calls cited in her Complaint, though that issue is not currently before the Court.

sufficient inquiry notice of the Terms and Conditions to create an agreement, and Defendant is a third-party beneficiary under the agreement.

As discussed herein, the Court must decide the issue of whether an agreement was made, rather than delegating that question to an arbitrator. While the undersigned finds that a person who visited the Website and clicked "Continue" assented to the Terms and Conditions (including the arbitration provision), the undersigned finds that the Court must hold a bench trial to determine whether Plaintiff, or someone acting on her behalf, actually visited the Website on September 11, 2018, in order to determine whether Plaintiff entered into an agreement to arbitrate.

### I. DELEGATION OF GATEWAY ISSUES

Defendant correctly argues that the arbitration provision at issue contains a delegation clause making gateway issues arbitrable. However, Defendant incorrectly argues that this delegation clause requires that the arbitrator, not the Court, determine whether an agreement was made in the first instance.

Courts must look to the wording of a delegation clause to ascertain whether it reflects the requisite "clear and unmistakable intent to arbitrate gateway issues." *Jones*, 866 F.3d at 1267. The requisite intent is present when the provision requires arbitration of "any dispute" concerning gateway issues. *Id.* In this case, the relevant provision delegates "exclusive authority [to the arbitrator] to resolve *any dispute* including any claim that all or any part of the Terms & Conditions, including this provision, are unenforceable." DE 16-2 at pp. 6-7 (emphasis added). Thus, the delegation provision clearly and unmistakably evinces an intent to arbitrate gateway issues; therefore, if Plaintiff agreed to the arbitration clause, the parties must arbitrate any gateway issues.

However, before this matter can be referred to arbitration to decide even gateway issues, the Court must find that Plaintiff agreed to the arbitration agreement in the first place. Plaintiff disputes that she did, and the Court must make this threshold determination regardless of whether a delegation clause exists. The clear text of 9 U.S.C. § 4 indicates that the Court should only direct the parties to proceed with arbitration once it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." While the parties are free to agree to alternative ways to resolve their disputes, including by agreeing to a delegation clause, this presupposes the existence of an agreement. After all, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Therefore, it is clear that the Court, not an arbitrator, should decide whether the parties entered into the arbitration agreement in the first instance.

Nevertheless, assuming Plaintiff agreed to the arbitration provision, the issue of whether Defendant is a third-party beneficiary under the agreement is one for the arbitrator to decide in light of the delegation clause. When a delegation clause exists, there are only two issues a court must decide (if contested) before compelling arbitration. As discussed above, one is "the making of the agreement for arbitration or the failure to comply therewith" if "in issue." 9 U.S.C. § 4. The other is a challenge specifically directed to the validity of the arbitration provision as opposed to the contract as a whole. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006) ("[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."). Notably, the Eleventh Circuit has recognized that there is "a two-step process required in considering the arbitrability of any contract containing an arbitration clause." *Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 (11th

Cir. 2012). Those steps are: "1) resolution of any formation challenge to the contract containing the arbitration clause, in keeping with *Granite Rock*; and 2) determination of whether any subsequent challenges are to the entire agreement, or to the arbitration clause specifically, in keeping with *Prima Paint*." *Id.* (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)).

Again, the Court must resolve Plaintiff's formation challenges notwithstanding the delegation provision. However, the second step is a non-issue because Plaintiff does not contest the validity of the arbitration provision—she only contests "that any agreement was made to begin with." DE 26 at n.1. Thus, if Plaintiff's third-party beneficiary argument falls into the first step—if it involves the making of the agreement—it is for the Court to decide. Otherwise, it is for the arbitrator to decide.

The undersigned finds that Plaintiff's third-party beneficiary argument is for the arbitrator to decide because it does not go to the issue of whether Plaintiff agreed to the Terms and Conditions (including the arbitration provision therein) in the first place. Interestingly, in a separate part of her Response, Plaintiff states that her "challenge to the 'validity' of the agreement is not based on construction of its terms" but rather whether "any agreement was made to begin with," thus acknowledging (at least implicitly) that issues requiring contract construction are for the arbitrator to decide. DE 26 at n.1. Yet, Plaintiff's third-party beneficiary argument implores the Court to engage in such construction. For instance, Plaintiff argues that the agreement is ambiguous with respect to its use of the term "marketing partners" and that it should, therefore, be construed against the drafter. *See id.* at pp. 11-14. This plainly goes beyond the issue of the making of the agreement. Given that the foregoing issue is not covered under either of the two steps the Eleventh Circuit

9

discussed in *Solymar*, the undersigned concludes that Plaintiff's third-party beneficiary argument is an issue for the arbitrator to decide if the Court compels arbitration.

Importantly, the Supreme Court has pronounced, in no uncertain terms, that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529-31 (2019). *See also Rent-A-Ctr.*, 561 U.S. at 67 ("The FAA . . . requires courts to enforce [arbitration agreements] according to their terms."). Here, the subject agreement provides the arbitrator with "exclusive authority to resolve any dispute," and any dispute encompasses the third-party beneficiary dispute. Therefore, giving full effect to the terms of the arbitration agreement, the Court must defer to the arbitrator on this dispute if arbitration is otherwise mandated.

## II. WEBSITE DESIGN AND ASSENT

If, as Plaintiff asserts, the Website's design could not lead to the formation of a contract absent evidence that the Website user had actual knowledge of the Terms and Conditions, then no trial would be necessary to determine whether Plaintiff used the Website. However, the person who visited the Website and clicked Continue manifested assent to be bound by the arbitration provision (contained in the Terms and Conditions) as a matter of Florida law. No genuine dispute of material fact regarding this issue exists.

As Florida courts have recognized, there are two main types of internet contracts, clickwrap agreements and browsewrap agreements. *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018) (citing *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA 2017)). "A 'clickwrap' agreement occurs when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have

read those terms and conditions." *Id.* (quoting *Vitacost*, 210 So. 3d at 762). "A 'browsewrap' agreement occurs when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the transaction without visiting the page containing the terms and conditions." *Id.* (quoting *Vitacost*, 210 So. 3d at 762). Courts generally enforce clickwrap agreements. *Vitacost*, 210 So. 3d at 762. Browsewrap agreements, however, "have only been enforced when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *MetroPCS*, 273 So. 3d at 1028 (quoting *Vitacost*, 210 So. 3d at 762).

In *MetroPCS*, the court considered whether a cell phone user had inquiry notice of an arbitration provision contained in MetroPCS's terms and conditions. *Id.* at 1026. The user received short monthly text messages from MetroPCS prompting him to pay for the next month's service. *Id.* at 1027. The text messages ended with the hyperlinked statement that "Terms & Conditions apply." *Id.* The court noted that the agreement (the terms and conditions) was more in the nature of a browsewrap agreement than a clickwrap agreement. *Id.* at 1028. Therefore, it considered whether the hyperlink was sufficiently conspicuous to put the user on notice that continued use of the service constituted assent to the terms and conditions. *See id.* at 1026-29 & n.1. Ultimately, the court concluded that notice was conspicuous, thereby rendering the agreement enforceable. *Id.* at 1029. Notably, *MetroPCS* did not require (or, apparently, even contemplate the need for) more explicit language informing the user that his act (use of the service) constituted acceptance of the terms. *See generally id.*

When faced with websites containing something less than a pure clickwrap agreement, other courts have similarly evaluated how conspicuous the hyperlink to the site's terms and

11

conditions was, and whether the site provided notice that a specific action would demonstrate acceptance of those terms, in deciding whether a user was put on sufficient inquiry notice such that the user assented to the terms. For example, in one of the most comprehensive analyses of the issue, the Ninth Circuit has said that where "there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30-31 (2d Cir. 2002)).

> Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage. Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement. On the other hand, where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements. In short, the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement.

*Id*. (internal citations omitted). *Nguyen*, and the cases it collects, thus describe a continuum for website designs, with unenforceable browsewrap agreements containing "tucked away" terms at one end, very explicit clickwrap agreements at the other end, and other designs in the middle, varying based on different factors including how clearly they link acceptance of terms to the user taking some action.

The Website at issue in this case falls near the center of this continuum.[3] But in light of the analysis in *MetroPCS*, under Florida law,[4] the design here is close enough to the clickwrap end of the spectrum to provide the requisite inquiry notice. Like in *MetroPCS*, this case has features of a browsewrap agreement in that a visitor to the Website is not required to view the Terms and Conditions or check a box acknowledging that he or she read the Terms and Conditions. However, the Website in this case has features that put a reasonable user on notice that he or she is assenting to the Terms and Conditions.

First, in terms of placement, the Website does not simply "tuck away" the Terms and Conditions in an obscure corner of the Website where a user is unlikely to encounter them. Rather, the statement regarding the Terms and Conditions is located directly above the Continue button that the user must click to proceed with using the Website. Thus, it is highly likely that the user would see the statement regarding the Terms and Conditions. On this factor, the Website provides at least as much notice as in *MetroPCS*, where the link to terms and conditions was placed at the end of a short text message to the user.

---

[3] Some courts have referred to the type of agreement at issue as "hybridwrap." *See, e.g.*, *Anand v. Heath*, No. 19-CV-00016, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019); *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 265-67 (E.D.N.Y. 2019).

[4] "In the absence of inter-district conflict or contrary precedent from [the Florida Supreme] Court, it is absolutely clear that the decision of a district court of appeal is binding precedent *throughout Florida*." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 973 n.4 (Fla. 2009) (citation omitted). *See also Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 775 (11th Cir. 2000) ("Absent a decision by the highest state court or persuasive indication that it would decide the issue differently, federal courts follow decisions of intermediate appellate courts in applying state law. Concomitantly, the Florida Supreme Court has held that [t]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by [the Florida Supreme] Court. Thus, in the absence of interdistrict conflict, district court decisions bind all Florida trial courts." (internal quotations marks and citations omitted)).

Second, rather than simply having a link that informs the user that Terms and Conditions merely exist, the short sentence regarding the applicability of terms and conditions specifically starts off by stating "I understand and agree." Thus, as *Nguyen* suggests, there is an explicit textual notice that continued use will act as a manifestation of an intent to be bound. A reasonable user confronting a sentence "I understand and agree to email marketing, the Terms & Conditions which includes mandatory arbitration, and Privacy Policy" would understand that he or she is assenting to the linked terms and, significantly, that those terms "include[] mandatory arbitration."

Finally, although the user is not required to check an acknowledgement box to accept the Terms and Conditions, he or she must take the affirmative act of clicking the Continue button directly below the relevant statement. In *MetroPCS*, however, the user was not required to click anything. There, the only affirmative action that the user needed to take was to pay his or her bill and continue using his or her cell phone service. The statement here does not explicitly indicate that clicking Continue is the affirmative act by which the user would manifest her acknowledgement of the "I understand and agree" statement. But its placement directly over the Continue button, combined with the fact that clicking "Continue" demonstrates a clearly manifested intent to continue using the Website, would strongly imply to a reasonable user a connection between the "I understand and agree" statement and clicking Continue. Again, the connection between continued use of the site (by clicking a button that literally says "Continue") and assent to the Terms and Conditions hyperlinked directly above the Continue button is at least as clear, if not clearer, than the connection between continued use of the cell phone service and assent to the terms and conditions in *MetroPCS*.

Plaintiff relies heavily on a Northern District of Illinois decision that examined a website design that was virtually indistinguishable from the design at issue here; in that case, the court

14

found the website did not provide the user with adequate notice. *See Anand*, 2019 WL 2716213, at *3-4 (finding that the plaintiff "was not placed on reasonable notice that she was manifesting assent to the terms and conditions by clicking the 'Continue' button," and, consequently, holding that the plaintiff did not manifest assent). The key to *Anand*'s conclusion was that the "I understand and agree" language, though placed directly above, the "Continue" button, did not expressly tell the user that clicking "Continue" would manifest assent. *Id*. However, the undersigned respectfully disagrees with *Anand* for the following reasons.

First, while *Nguyen* did note that "the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice" without language indicating that some affirmative action will constitute assent to hyperlinked Terms and Conditions, 763 F.3d at 1178-79, the *Anand* decision gives insufficient weight to the combination of: (1) the proximity of the statement regarding Terms and Conditions (appearing directly above the Continue button) and (2) the "I understand and agree" language that accompanied the hyperlink to the Terms and Conditions. As described above, although explicit language stating "**By clicking Continue** I understand and agree . . ." would have given the user even clearer notice, the logical implication of the "I understand and agree" language being placed directly above the Continue button is sufficiently strong that a reasonable user would understand the effect of pressing Continue. Second, none of the cases on which *Anand* relies dictate its conclusion. None of the precedents it cites finding insufficient notice involved the combination of the language and proximity presented here. Finally, and most importantly, *Anand* applied Illinois law, while Florida law applies in this case. To the extent that *Anand* assesses how much weight to afford to the different factors relevant to the sufficiency of notice, *MetroPCS* assesses the issue differently, and the undersigned must follow *MetroPCS* in applying Florida law. Therefore, as a matter of Florida law, there is no genuine dispute of material

fact as to whether the person who clicked Continue on the Website assented to the Terms and Conditions.

### III. WHETHER PLAINTIFF VISITED THE WEBSITE

However, the undersigned does find that a genuine dispute of material fact exists with respect to whether Plaintiff (or someone with authority to act on her behalf) visited the Website, and clicked "Continue," on the date and time in question. Thus, the making of the arbitration agreement presents a genuine issue for trial. Defendant meets its initial burden (for summary judgment purposes) by showing that someone identifying herself or himself as Plaintiff was the person who went to the Website. Significantly, it is undisputed that all of Plaintiff's personal information that was entered on the Website is accurate. However, Plaintiff has provided a declaration containing specific, colorable, and non-conclusory facts that show there is a genuine issue for trial. She has very clearly and specifically denied visiting the Website at any time prior to the filing of the Motion (which was filed almost a year after Defendant asserts Plaintiff went to the Website). She has also sworn that she did not authorize anyone to go to the Website on her behalf. Therefore, a reasonable factfinder could find for either party on the issue of whether Plaintiff, or a person with authority to act for her, went to the Website, on the date and time in question, and clicked Continue. Consequently, it is necessary to hold a trial on this issue.

Notably, under similar factual circumstances, Judge Middlebrooks found that a trial on the making of an arbitration agreement was necessary because "Plaintiffs' denials place[d] at issue the existence of binding agreements to arbitrate." *See Hilton v. Fluent, LLC*, 297 F. Supp. 3d 1337, 1342-43 (S.D. Fla. 2018). Although the necessity of a trial was strengthened in *Hilton* because of "the curious circumstances under which their phone numbers came to be associated with other

16

purportedly inaccurate personal data," it does not appear that the result would have been different even if the personal information was accurate. *Id.* at 1343.

Defendant points to the accuracy of the personal information as an indication that there is no genuine dispute. Relatedly, Defendant complains that Plaintiff has not produced her web-browsing history or more particular evidence regarding her IP address to refute Defendant's presumption, based on probative evidence, that Plaintiff visited the Website. While the fact that the information submitted to the Website accurately describes Plaintiff serves to strengthen Defendant's position, it does not preclude a reasonable factfinder from finding for Plaintiff. Moreover, Defendant's complaint about the lack of additional evidence is unavailing (at least for summary judgment purposes) where Defendant has the burden to prove the existence of the contract it seeks to enforce. *See Bazemore*, 827 F.3d at 1330; *CEFCO v. Odom*, 278 So. 3d 347, 352 (Fla. 1st DCA 2019) ("The party seeking enforcement of an agreement has the burden of establishing that an enforceable agreement exists.").

Given that a trial is necessary, the next question is whether it should be a jury trial or a bench trial. The answer is a bench trial inasmuch as Plaintiff waived her statutory right to a jury trial on the issue of whether an agreement was made. *See Burch*, 861 F.3d at 1346-50. That is because Plaintiff failed to specifically demand a jury trial on the issue of the making of an arbitration agreement on or before the deadline for Plaintiff to respond to the Motion. *See id.* at 1349 & n.17. She did not specifically demand a jury trial in her Response [DE 26] nor in any separate filing. Although Plaintiff did request a jury trial in her Complaint [DE 1] "of all claims that can be so tried," such a general demand is insufficient to satisfy the procedure required in 9 U.S.C. § 4. *See id.* at 1346-50. In light of the foregoing, the Court should proceed summarily to a bench trial. *See id.*; 9 U.S.C. § 4.

17

## **CONCLUSION**

For the reasons discussed above, the undersigned **RECOMMENDS** that the District Court **DENY** the Motion [DE 16] **WITHOUT PREJUDICE** and that it hold a trial on the issue of whether Plaintiff (or someone authorized by Plaintiff) was the person who visited the Website and clicked the "Continue" button on September 11, 2018 at approximately 11:09 a.m. EST. If the Court finds that Plaintiff (or someone authorized by Plaintiff) was that person, the undersigned recommends that the District Court revisit its ruling, **GRANT** the Motion, and compel arbitration.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida on this 13th day of May 2020.

Jared M. Strauss
United States Magistrate Judge